**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 1:16-cv-2870-WJM-MJW

LENWOOD ROBINSON, individually,

      Plaintiff,

v.

REGIONAL TRANSPORTATION DISTRICT, a political subdivision of the State of
Colorado,

      Defendant.

---

**ORDER GRANTING IN PART AND DENYING IN PART**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

      Plaintiff Lenwood Robinson ("Robinson") brings this action against his former

employer Defendant Regional Transportation District ("RTD") under Title VII of the Civil

Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. ("Title VII"), the Colorado Anti-

Discrimination Act, Colo. Rev. Stat. §§ 24-34-401 *et seq*. ("CADA"), and 42 U.S.C.

§ 1981.[1] (ECF No. 5.) Robinson alleges that RTD discriminated against him on the

basis of race and retaliated against him for engaging in protected activities.

      Currently pending before the Court is RTD's Motion for Summary Judgment (the

"Motion") on Robinson's claims. (ECF No. 78.) For the reasons set forth below, the

Motion is granted in part and denied in part. Moving forward, Robinson will have a sole

claim for under Title VII and CADA for retaliatory termination.

---

[1] Plaintiff also alleged claims for breach of contract, promissory estoppel, and restraint
of free speech. (ECF No. 5 at 8, 11.) The parties stipulated to dismissal of these three claims
with prejudice. (ECF No. 125.)

## I. BACKGROUND

### A.   Robinson's Employment at RTD[2]

Robinson, an African-American male, started as a Service Desk Analyst in the

RTD Information Technology Division on September 12, 2013.  Robinson had

previously worked for RTD as a bus operator.  During the relevant time period, there

were three Service Desk Analysts, Robinson, Moumita Das, and Asaundra Rhymer.

(ECF No. 78-3 at 8, 12.)  The Service Desk Analyst position required providing support

to end-users for PC hardware, operating systems, software applications, and

communication devices.

#### 1.   Conflict with Ms. Das and Initial Discipline

Robinson had disagreements with Das.  Robinson testified that Das felt the need

to regularly monitor and change his work, even though he was familiar with RTD

systems and hired before Das.  (ECF No. 78-1 at 14–15.)  He also testified that Das

introduced errors to his work and, in turn, created additional work for the service desk

team.  (*Id*. at 18–19.)

On September 5, 2014, Robinson informed the IT Service Delivery Manager

Todd Peterson[3] about his issues with Ms. Das.  (ECF No. 115-2 at 2; ECF No. 78-3 at

13.)  In an e-mail, Robinson explained a particular issue and noted his ongoing

---

[2]  The following factual summary, viewed in the light most favorable to the nonmoving
party, is based on the parties' briefs on the Motion and documents submitted in support.  These
facts are undisputed unless attributed to a party or source.  All citations to docketed materials
are to the page number in the CM/ECF header, which sometimes differs from a document's
internal pagination.

[3]  Formerly Todd Verrastro.

concerns about Das's interference with his work.  (ECF No. 115-2 at 2.)  Robinson also talked to Peterson about Das's apparent interference and auditing.  (ECF No. 78-1 at 14–15.)  Peterson and Robinson apparently met to discuss the issues, but there is no documentation to suggest that Peterson took any action on Robinson's complaint or that Das was disciplined at that time.  (ECF No. 115-1 at 2, ¶¶ 12–13; ECF No. 115-2; ECF No. 78-1 at 100.)  Robinson did not raise the issue with anyone in the human resources department.  (ECF No. 78-1 at 15.)  RTD acknowledges that Robinson raised his concerns about Das to management in September 2014.  (ECF No. 124 at 4, ¶ 27.)

Neither party affirmatively cites any other record or allegation of any Robinson's complaint to a manager or supervisor about Das between September 2014 and June 2015.  However, from the documents submitted in support or opposition to this Motion, it is clear that Peterson was aware of an ongoing conflict between Robinson and Das. Specifically, Robinson testified that on May 8, 2015, there had been a "loud discussion" and "a blowup" at the service desk after Das had "audited my work once again."  (ECF No. 78-1 at 15.)  In response, Peterson proposed meeting to discuss.  (*Id.*; ECF No. 78-6.)  Robinson stated that he would raise the issue with a senior manager and, according to Robinson, Peterson discouraged him from doing so.  (ECF No. 78-1 at 15.) Robinson accuses Peterson of favoring Das because of their friendship.  (*Id.*)  It is unclear from the record how or whether this conflict stemming from the May 8 incident was resolved.

On June 5, 2015, Robinson e-mailed Aprajit Desai—another RTD employee and Das's spouse—about Das's interference with Robinson's work.  In the e-mail, Robinson explained that an "ongoing conflict on the Service Desk" between Das and Robinson

3

was "adversely affecting our professional relationships with each other and our co-workers." (ECF No. 78-5 at 2.) He explained that he did not want to involve senior managers "in such a trivial matter but I need to be able to do my job without her interfering." (*Id*.) Robinson also added "[a]s her husband I am asking you to please ask her to stop with the auditing and correcting of my work." (*Id*.) Robinson also called Desai and left a voicemail.

That same day, Desai informed the human resources department about Robinson's e-mail and phone call. Peterson summoned Robinson to his office and tried to discuss the email. Robinson got upset during the meeting and left Peterson's office.

On June 10, 2015, Peterson prepared and sent a memorandum (the "June 10 Memo") to Robinson, Robinson's personnel file, and human resources department detailing Peterson's concerns with Robinson's performance. (ECF No. 78-6 at 2.) The June 10 Memo identified two primary issues with Robinson's performance: (1) "lack of respect and professionalism given to team members," and (2) "lack of respect and professionalism given to management team." (*Id*.) Under the first issue, Peterson further identified two sub-issues: "voicing concerns in a tone and at a level that can be easily overheard by others," and "voicing concerns to the wrong people, including outside our team." Peterson cited as an example Robinson's e-mail and phone contact with Desai. The second issue concerned Robinson "walking out in the middle of conversations and meetings with Management." Robinson apparently had, on two occasions, refused to discuss personnel issues with Peterson. The first time was after the May 8 "blowup;" the second after Robinson was summoned to Peterson's office on June 5 to discuss the e-mail and call to Desai. The June 10 Memo also explained that

failure to correct performance issues could result in further disciplinary action including termination of employment. (*Id.* at 3.)

Also on June 10, 2018, RTD issued Das a "counseling memo" for auditing and correcting the work of a coworker. (ECF No. 78-2 at 10.) Robinson was not informed because of the confidential nature of employee discipline. (*Id*. at 10–11.)

2. <u>Job Application</u>

On June 8, 2015—around the time that Robinson e-mailed Desai and Peterson issued the June 10 Memo—Robinson submitted an internal job application for a Computer Support Analyst ("CSA") position. The CSA position involved planning, installing, configuring, and programming proprietary micro-processing work stations and coordinating installation, maintenance, and repair of workstation hardware. (ECF No. 78-8 at 2–3.) The job required a bachelor's degree in computer science, mathematics, management information systems, or similar field; one year of experience in installation and use of computers and/or office automation systems and kiosk-based computer systems; two years of experience with data communications, micro-computer functions/characteristics, and hardware/software architecture; two years experience with testing procedures and safe practices; and proficiency in software packages, operating systems, and data processing documentation techniques. It also required the ability "to communicate effectively, orally and in writing . . . [and] use sound judgment." (*Id*. at 3.) Alternatively, an applicant could have "an equivalent combination of education, experience, knowledge, skills, and abilities."

RTD received Robinson's application on June 9. Bill Baker was the supervisor for the CSA position and the person responsible for hiring. Roger Vesley, a human

resources analyst, was involved in reviewing applications and the interview process. On June 30, 2015, Robinson's application was terminated because, according to RTD, he was not qualified based on his prior experience. (ECF No. 78-13 at 2.) Robinson contends that he was indeed qualified for the position. (ECF No. 115 at 9, ¶ 66; ECF No. 78-7 at 15–16.)

Two candidates were selected for the CSA position: Brian Cook, a white male with many years of relevant experience in desktop support, and Yolanda Bell, a mixed-race (Asian and Caucasian) female who had previously interned for Baker. (ECF No. 78-2 at 36, 38; ECF No. 79-1 (resume of Brian Cook); ECF No. 79-2 (resume of Yolanda Bell)).

The parties disagree about Robinson's qualifications, Bell's qualifications, and the relative qualifications of the two. (*Compare* ECF No. 78 at 7, ¶¶ 29–31 *with* ECF No. 115 at 9, ¶ 67.)[4] Complicating this dispute is RTD's lack of response to Robinson's "statement of additional material facts that are not in dispute" that Robinson did, and Bell did not, have the education or experience required for the position. (ECF No. 115 at 9, ¶¶ 66–67.) The Court is thus left to parse through the disagreement on relative qualifications.

The following facts are a summary of Bell's qualifications. Bell did not have a degree in one of the required fields, but was expected to earn a bachelor of science

---

[4] Robinson failed to comply with this Court's Revised Practice Standards because he did not title a section of his response brief "Statement of Additional Disputed Facts." *See* WJM Revised Practice Standards III.E.5 & .6(b). In its reply, RTD responded to certain of Robinson's factual assertions, but did not address Robinson's claim that Bell did not have the education or experience required for the position.

degree in Information Technology from Colorado Technical University in August 2015, around the time that the CSA position would begin.  (ECF No. 79-2 at 2.)  Bell's resume states that she completed certificate courses in "Networking Technology/Cisco Networking" and "Computer Information Technology" at Fayetteville Technical Community College.  (*Id.*)  She was not an RTD employee at the time of her application, but had previously interned for RTD.  (*Id.*)  Between 2005 and 2012, Bell served as a psychological operations specialist for the U.S. Army, and later as an instructor in the U.S. Army Reserve at Fort Bragg, NC.  (*Id.*)  As a psychological operations specialist, Bell had "collaborated in the development and implementation of initial networking equipment and infrastructure."  (*Id.*; ECF No. 78-2 at 37.)  At the Rule 30(b)(6) deposition, Heather McKillop[5] testified on behalf of RTD that Baker told McKillop that Bell's work in the Army involved in setting up networking equipment.  (*Id.*)

Robinson had the following qualifications.  Robinson earned two bachelors of science degrees from Metropolitan State College, one in Aviation Management/Information Systems in 1993 and the other in Network Security/Web Development in 2004.  (ECF No. 78-7 at 16.)  Robinson also had several certifications in information technology, including a Windows 7 Desktop Support Technician certificate from New Horizons Learning Centers (2011), a certificate in Information Technology Infrastructure Library ("ITIL") (2014), and a certificate of "A+" from CompTIA (2015).  (*Id.*)  At the time of his CSA application, Robinson had worked as a Service Desk Analyst for two years providing support to RTD employees.  (*Id.* at 14.)

---

[5]  Formerly Heather Copp.

After RTD notified Robinson that his application had been terminated, Robinson met with McKillop in July 2015. At that meeting, Robinson raised his concern about not being selected for the CSA position, which would have been a promotion from his current position. (ECF Nos. 78-13 at 2; ECF No. 115 at 23.) On July 20, 2015, McKillop sent Robinson a memorandum stating that she had looked into whether Robinson was not promoted based on "a recent incident that had occurred" (presumably, the events leading up to and including the June 10 Memo). McKillop explained that Robinson was not selected because of his lack of relevant or recent experience in desktop support. Specifically, McKillop stated that Robinson's last desktop support experience was in 2003; Robinson's desktop support experience from 2003 was not relevant to current issues because of the pace of change in the industry; Robinson's experience as a Service Desk Analyst was not relevant desktop support because it was not "hands on" experience; and numerous other applicants had more current or relevant experience providing desktop support. (ECF No. 78-13 at 2.) Robinson disagrees with the veracity of McKillop's statements because his certifications were from the last four years. (ECF No. 115 at 5, ¶ 35.) McKillop added that the "incident" (presumably, the events leading up to and including the June 10 Memo) had been handled discreetly and that she had "no reason to believe that Mr. Baker, the hiring manager, was aware of the incident." (ECF No. 78-13 at 2.)

3.    Performance Review, Performance Improvement Plan, and Termination

Robinson thereafter continued to work as a Service Desk Analyst on the IT service desk. In September 2015, the IT Division was reorganized and Baker became Robinson's supervisor.

Also in September 2015, RTD gave Robinson his annual performance review, with Peterson providing the majority of the feedback. Robinson received an overall rating of 2.9 out of 5. He received his lowest proficiency ratings ("2—Needs Improvement" out of a possible 5 points) in analysis and communication. For analysis, Peterson suggested that Robinson need to improve his resolution of tickets and troubleshooting. (ECF No. 78-14 at 2.) For communication, Robinson's proficiency rating was partially based on his call and e-mail to Das's spouse, though Peterson noted that he had observed "significant improvement in this area, particularly with respect to [Robinson's] interaction with his peers." (*Id.* at 3.) Other than those areas, Robinson earned a "3-Achieved Goal" or "4-Exceeds Expectations" in each area of evaluation. (*Id*. at 3–6.) Robinson characterized the performance review as "very unfair and vindictive." (*Id*. at 2.)

On January 28, 2016, Baker and Brett Feddersen (Manager of Shared Technical Services) gave Robinson a Performance Improvement Plan ("PIP") which raised "serious areas of concern, gaps in [Robinson's] work performance." (ECF No. 78-15 at 2.) The purpose of the PIP was to inform Robinson of performance issues and give him the opportunity to "demonstrate improvement and commitment." (*Id*.) Robinson contests the veracity of the PIP, but acknowledges that he received it on January 28. (ECF No. 115 at 5, ¶¶ 37–38.)

The PIP identified two areas in which Robinson had failed to meet expectations: professional conduct and technical skills. (ECF No. 78-15 at 4.) The PIP identified four instances of "unprofessional behavior," three of which occurred in November 2015 and arose out of difficulty resolving an issue with an RTD director's e-mail and one of which

9

stemmed from Robinson missing a meeting in January 2016. (*Id*. at 5.) On the technical side, the PIP explained issues with Robinson's performance and cited examples of each issue:

- Failure to contact technicians on cellular phone (rather than desk phone) regarding a high priority issue;

- Failure to include information in service desk tickets, such as computer name, troubleshooting steps attempted, or elevation to another support group;

- Failure to correctly diagnose priority level of issue;

- Lack of troubleshooting on particular issues, including failure to follow documented procedures regarding network printers before escalating issues and alerting an evening caller that the Service Desk would be available the next day; and

- Failing to respond to a critical incident within thirty minutes while on call.

(*Id*. at 7–9.)

In addition to identifying problem areas, the PIP set forth next steps and warned Robinson that failure to correct performance issues could result in additional disciplinary action, including termination. (*Id*. at 9.) The PIP required that Robinson develop an action plan to address "critical areas" and schedule a meeting with Baker by February 19, 2016 to review the proposed action plan (also, confusingly, called a Performance Improvement Plan). The final action plan was due by February 26, 2016. In addition, Robinson was to schedule regular meetings with Baker to provide updates on his "progress toward resolving the identified performance issues." The PIP also required

Robinson to attend a "Know Thyself" course from February 25–26, 2016, and instructed

Robinson to register for the course "as soon as possible." Finally, the PIP placed

Robinson on two days of paid administrative leave to reflect on the contents of the PIP

and how Robinson would approach the assignments therein. Robinson refused to sign

the PIP.

After receiving the PIP, Robinson was out of the office for two days on paid

administrative leave and took several additional days of personal time.

Robinson prepared two written responses to the PIP. On February 5, 2016,

Robinson sent his initial response to David Genova, attaching commentary on each

area of concern raised in the PIP. (ECF No. 78-16 at 12.) Robinson asked Genova to

read the attachments and determine whether they comported with RTD procedure.

(*Id*.) Baker advised Robinson to revise his initial responses and, on February 15, 2016,

Robinson sent his PIP response to Baker and Feddersen, again addressing each area

of concern raised in the PIP and how Robinson proposed handling similar situations in

the future. (*Id*. at 2–11; ECF No. 78-1 at 29.) These responses differed from those

sent to Genova.

On February 22, 2016, Robinson attempted to register for the Know Thyself

course for the following week. (ECF No. 78-18.) It was already full and Robinson was

unable to register for the February 25–26 session of the course. (ECF No. 78-1 at 32.)

On February 23, 2016, Baker issued Robinson a written warning. (ECF No. 78-

17.) In that warning, Baker explained that Robinson had failed to meet the first two

deadlines in the PIP, thereby undermining Baker's trust in Robinson. (*Id*. at 2.) Baker

also expressed his view that Robinson did not understand the purpose or intent of the

PIP, and that Robinson lacked commitment to improving his actions and behavior. (*Id*.) Baker included additional concerns about Robinson's behavior. (*Id*. at 3.) Baker set forth seven expectations for Robinson in bullet points that included scheduling a meeting to review a proposed plan for improvement by February 26, enrolling in the first available Know Thyself course by February 29, removing "Bus Driver" from Robinson's e-mail signature, not wearing a bus driver uniform on Fridays, and fully complying with the PIP. (*Id*. at 2–3.) In closing, Baker advised Robinson that he would take additional disciplinary action if Robinson failed to adhere to the expectations. (*Id*. at 3–4.)

Robinson registered for the Know Thyself course on March 1, 2016, and forwarded the notice to Baker that same day. (ECF No. 78-19.) It is unclear from the record whether Robinson complied with the other expectations set forth by Baker in the written warning.

Two additional work incidents occurred at the end of February. On February 24, 2016, Robinson and another employee had a "confrontation." (ECF No. 78-20 at 2.) RTD states that Robinson failed to immediately enter a service ticket and yelled at his co-worker. (ECF No. 78 at 12, ¶ 49; ECF No. 78-20 at 2.) Robinson claims that he immediately entered the service ticket and testified at his deposition that his co-worker yelled at him. (ECF No. 115 at 6, ¶ 49; ECF No. 78-1 at 35.) On February 26, Robinson remotely accessed a computer different than the one he was supposed to be working on. (ECF No. 78 at 12, ¶ 49; ECF No. 78-20 at 2–3; ECF No. 78-1 at 36.) When asked about this by Baker and another supervisor, Robinson stated that he did not do any work on the computer. (ECF No. 78-1 at 37.)

On March 1, 2016, Baker recommended that RTD terminate Robinson's

employment.  (ECF No. 78-20.)  Baker cited the two additional incidents at the end of February as evidence that Robinson's professional conduct continued to deteriorate and that Robinson continued to fail to follow protocols.  (*Id*. at 2–3.)

On March 4, 2016, McKillop presided over Robinson's pre-termination hearing pursuant to RTD regulations.[6]  At the hearing, Robinson had the opportunity to present facts and arguments to support his contention that his employment should not be terminated.

On March 11, 2016, McKillop upheld Baker's recommendation and sent Robinson a termination letter.  As a basis for the recommendation to terminate, McKillop cited examples of Robinson's problematic workplace behavior, including the June 10 Memo, Robinson's October 2015 performance review, the January 2016 PIP, the February 23 written warning, and the two additional incidents in February 2016.  McKillop stated that Robinson had an opportunity to improve, but failed to present any facts showing the steps Robinson had taken to improve.  (ECF No. 78-21 at 4.)  Robinson's termination was effective March 11, 2016.  (*Id*.)

**B.    Procedural History**

1.    Internal Complaints and Discrimination Charges

Robinson filed two separate charges with the Colorado Civil Rights Division ("CCRD") and the Equal Employment Opportunity Commission ("EEOC").

---

[6]  Robinson did not respond to paragraphs 51–69 of RTD's Statement of Material Facts in the Motion.  Therefore, these paragraphs in the Statement of Material Facts stand unrebutted for summary judgment purposes.  *See* WJM Revised Practice Standards III.E.5 & .6(b).

### a. *First Charge*

The day after receiving the June 10 Memo, Robinson filed a complaint with RTD's EEO Office. That office investigated Robinson's complaint by speaking with Robinson on June 19, 2016, Peterson on July 6, and David Holland and Asaundra Rhymer on July 7. (ECF No. 78-10 at 9-12.) Based on a review of the available information, on July 9, RTD issued a letter to Robinson stating that it had "insufficient evidence" to conclude that Mr. Robinson's treatment was based on his race, color, or other protected class, and that the "evidence is at best inconclusive." (*Id*. at 16.)

On August 3, 2015, Robinson filed a Charge of Discrimination with the CCRD and EEOC, which was docketed as CCRD Charge No. D20160009 and EEOC Charge No. 541-2015-01743 ("First Charge"). (ECF No. 78-27.) The First Charge alleged discriminatory discipline and refusal to promote on the basis of race and as retaliation for engaging in protected activities.

After Robinson's termination, CCRD issued a finding of "no probable cause" on the First Charge. Robinson appealed CCRD's finding to the Colorado Civil Rights Commission. In the meantime, Robinson requested a substantial weight review from EEOC. On June 27, 2016, CCRD issued a letter informing Robinson that the Commission affirmed CCRD's finding of no probable cause and telling Robinson that he had ninety days in which to file his state claims. On August 17, 2016, EEOC sent Robinson a letter and official notice explaining that EEOC adopted the findings of the state agency and informed Robinson of his right to file a civil action on his federal claims.

b.    *Second Charge*

On May 15, 2016, several days after his termination, Robinson filed another Charge of Discrimination with CCRD and EEOC, which was docketed as E20160800 and 32A-2016-00235, respectively ("Second Charge").  (ECF No. 5 at 19.)  The Second Charge alleged that RTD retaliated against Robinson for filing racial discrimination claims by disciplining him between January–March 2016 and terminating his employment.  (ECF No. 78-30 at 2–3.)

On September 2, 2016, CCRD issued a "no probable cause" determination.  On October 7, 2016, EEOC issued a Dismissal and Notice of Rights on the Second Charge informing Robinson that it had adopted the findings of the state agency and that he must file any lawsuit on his federal claims within ninety days.

2.    Litigation

Robinson instituted this litigation on November 10, 2016, alleging violations of state and federal law in Colorado state court.  (ECF No. 5.)  RTD removed the action to this Court on November 23, 2016.  (ECF No. 1.)

The parties have stipulated to dismissal of Robinson's claims for breach of contract, promissory estoppel, and restraint of free speech under 42 U.S.C. § 1983. (ECF No. 125.)  The Court also granted RTD's motion to dismiss Robinson's CADA claims for racial discrimination and retaliation arising from the First Charge for lack of subject matter jurisdiction.  (ECF No. 140.)

## II. LEGAL STANDARD

Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994). Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or, conversely, is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248-49 (1986); *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132 (10th Cir. 2000); *Carey v. U.S. Postal Serv.*, 812 F.2d 621, 623 (10th Cir. 1987).

A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable juror could return a verdict for either party. *Anderson*, 477 U.S. at 248. The Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *Quaker State Mini-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995); *Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325. Where the non-movant bears the burden of proof at trial, the non-movant must then point to specific evidence establishing a genuine issue of material fact with regard to each challenged element. *See Reed v. Bennett*, 312 F.3d 1190, 1194 (10th Cir. 2002); *In re Ribozyme Pharms., Inc. Sec. Litig.*, 209 F. Supp. 2d 1106, 1111 (D. Colo. 2002).

### III. ANALYSIS

RTD moved for summary judgment on Robinson's remaining causes of action for racial discrimination and retaliation, namely: (1) race discrimination in violation of Title

VII and CADA for the January–March 2016 discipline and termination; (2) race

discrimination in violation of Title VII for discipline in June 2015; (3) race discrimination

in violation of Title VII and 42 U.S.C. § 1981 for non-hiring;[7] (4) retaliation in violation of

Title VII for non-hiring; and (5) retaliation in violation of Title VII and CADA for

Robinson's termination.  (ECF No. 78; *see* ECF No. 5 at 9–11; ECF No. 125 (voluntarily

dismissing certain claims); ECF No. 140 (granting a motion to dismiss certain state law

claims for lack of subject matter jurisdiction).)

In its Motion, RTD argues that it is entitled to summary judgment on each of

these claims.  (ECF No. 78.)  The Court will examine each of these claims in turn.

## A.      Legal Standard for Racial Discrimination and Retaliation Claims

The framework for analyzing claims under Title VII is well established.  A plaintiff

may either present direct evidence of discriminatory motivation or establish a prima

facie case under the familiar *McDonnell Douglas* burden-shifting test.  *Garrett v.*

*Hewlett-Packard Co.*, 305 F.3d 1210, 1216 (10th Cir. 2002).  Under the three-step

analysis of *McDonnell Douglas*, a plaintiff must first set forth a prima facie case of racial

discrimination or retaliation.  *Id.*  If plaintiff establishes a prima facie case, the burden

shifts to defendant to articulate a legitimate, nondiscriminatory basis for its employment

decision.  *Id.*  If the defendant does so, the inference of discrimination drops out and

the burden shifts back to the plaintiff.  *Id.*  At that point, the plaintiff must offer evidence

to "show that his race . . . or other illegal consideration was a determinative factor in the

---

[7]  Robinson's 42 U.S.C. § 1981 claim relates only to his non-hiring.  Robinson makes no
factual allegations under § 1981 related to the January–March 2016 discipline or his
subsequent termination.  (ECF No. 5 ¶¶ 101–107.)

defendant's employment decision, or show that the defendant's explanation for its action was merely pretext." *Id*. A plaintiff may establish pretext by showing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Jones v. Okla. City Pub. Schs.*, 617 F.3d 1273 (10th Cir. 2010). To determine whether evidence of pretext permits an inference of discrimination, the court considers "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered." *Bennett v. Windstream Commc'n, Inc.*, 792 F.3d 1261, 1268 (10th Cir. 2015) (quoting *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 149 (2000)).

"CADA discrimination and retaliation claims are subject to the same legal standards as Title VII claims." *Agassounon v. Jeppesen Sanderson, Inc.*, 699 Fed. App'x 507, 509 (10th Cir. 2017). Similarly, the analytical framework of *McDonnell Douglas* "applies equally to claims brought pursuant to [42 U.S.C.] section 1981" for racial discrimination. *Kendrick v. Penske Transp. Servs. Inc.*, 220 F.3d 1220, 1225–26 (10th Cir. 2000). As such, this Court will analyze the corresponding state and federal statutory claims together.

## B.    Racial Discrimination

Robinson brings a claim for race discrimination alleging that he was treated less favorably than non-minority employees. Specifically, he asserts that, because of his

race, he was not selected for the CSA position, disciplined in June 2015, unable to apply for a desktop support position, disciplined again between January–March 2016, and ultimately terminated.

### 1. January–March 2016 Discipline and Termination (Title VII, CADA)

Before the Court may reach the issue of Robinson's prima facie claims of race discrimination, the Court must consider whether the claims are properly before the Court. *Jones v. Needham*, 856 F.3d 1284, 1289 (10th Cir. 2017). RTD argues that Robinson failed to exhaust his administrative remedies on his racial discrimination claims regarding (1) his inability to apply for a Desktop Support position; (2) discipline other than the June 10 Memo; (3) instructions not to wear a bus driver uniform (which was part of Robinson's January–March 2016 discipline); and (4) Robinson's termination. (ECF No. 78 at 27.) In response, Robinson summarily argues that he has indeed exhausted his administrative remedies. (ECF No. 115 at 13.) The Court agrees with RTD that Robinson failed to exhaust his administrative remedies as to the listed claims.

Before filing suit under Title VII, a plaintiff must exhaust his administrative remedies with either the EEOC or the appropriate state employment practices agency. *Shikles v. Sprint/United Mgmt. Co.*, 426 F.3d 1304, 1317 (10th Cir. 2005). In addition to those specific claims presented to the EEOC, the Court may exercise jurisdiction over claims falling within "the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC." *Jones v. U.P.S., Inc.*, 502 F.3d 1176, 1186 (10th Cir. 2007) (internal quotation marks and citation omitted). An EEOC charge must "contain the facts concerning the discriminatory and

19

retaliatory actions underlying each claim; this follows from the rule that each discrete incident of alleged discrimination or retaliation constitutes its own unlawful employment practice for which administrative remedies must be exhausted." *Jones v. U.P.S.*, 502 F.3d at 1186; *see also McGarr v. Peters*, 2009 WL 3855938, at *5–6 (W.D. Okla. Nov. 17, 2009) (holding that plaintiff failed to exhaust his age-based failure to promote claim where plaintiff's EEO complaint only identified an age-based hostile work environment claim). "[B]ecause failure to exhaust administrative remedies is a bar to subject matter jurisdiction, the burden is on the plaintiff as the party seeking federal jurisdiction to show, by competent evidence, that she did exhaust." *McBride v. CITGO Petroleum Corp.*, 281 F.3d 1099, 1106 (10th Cir. 2002).

Robinson filed his First Charge and Second Charge with the CCRD and EEOC. The First Charge claimed racial discrimination and retaliation for discipline received in June 2015 and non-hiring. (ECF No. 78-27 at 2.) The Second Charge also did not mention any inability to apply for a desktop support position. Nowhere did Robinson allege that he had been unable to apply for a desktop support position, and indeed the record reflects that he corresponded with RTD about a potential position after filing the First Charge. (ECF No. 115-4.) Because Robinson never raised this issue administratively, it is not properly before the court. *See McBride*, 281 F.3d at 1106.

The record also shows that Robinson's Second Charge relates only to retaliation, not racial discrimination, related to discipline from January–March 2016 and his termination. (ECF No. 78-30 at 2.) Unlike the First Charge, Robinson did not list "race" under the "discrimination based on" portion of the Second Charge. Nor did Robinson mention discrimination based on race in his "discrimination statement" or the document

20

that he attached to the Second Charge. (ECF No. 78-30 at 2–3.) While the Court is permitted to exercise jurisdiction over claims falling withing the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination," *Jones v. U.P.S., Inc.*, 502 F.3d at 1186, nothing in Robinson's Second Charge makes any claim of discrimination based on race. (ECF No. 78-30.) In response to RTD's Motion, Robinson provides only a conclusory argument that he has indeed exhausted his administrative remedies. (ECF No. 115 at 13.) But Robinson fails to point to any evidence to suggest that his Second Charge could be understood to encompass a racial discrimination claim. (*Id*.) Because Robinson first raised his Title VII and CADA racial discrimination claim for the January–March 2016 discipline and his termination in his Complaint filed in this action, those claims are not properly before the Court. *See McBride*, 281 F.3d at 1106.

Accordingly, the Court dismisses without prejudice Robinson's racial discrimination claims under Title VII and CADA arising out of Robinson's Second Charge, discipline other than the June 10 Memo, and inability to apply for a desktop support position for failure to exhaust administrative remedies.[8]

2.    June 2015 Discipline (Title VII)

a.    *Prima Facie Case of Discriminatory Discipline*

To establish a prima facie case for racial discrimination, Robinson must show that (1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an

---

[8]  While 42 U.S.C. § 1981 does not require administrative exhaustion, Robinson failed to raise any of these incidents under his 42 U.S.C. § 1981 cause of action.

inference of racial discrimination.  *Jones v. Denver Post Corp.*, 203 F.3d 748, 753 (10th Cir. 2000).  Robinson clearly satisfies the first and second prongs of a prima facie case based on racial discrimination.  Indeed, the parties do not dispute that, as an African American, Robinson is a member of a protected group or that Robinson was disciplined.  Thus, to make out a prima facie case, Robinson must demonstrate that the June 2015 discipline gives rise to an inference of racial discrimination.

To support an inference of racial discrimination, Robinson cites the June 10 Memo's criticisms of Robinson workplace behavior.  (ECF No. 115 at 20.)[9]  That memorandum disciplined Robinson in part for "[v]oicing concerns in a tone and at a level that can be easily overheard by others."  (ECF No. 78-6 at 2.)  Discipline for such actions could give rise to an inference of discrimination, particularly if other similarly situated employees were not disciplined for such behavior.  The Court, however, need not determine whether discipline for this reason does in fact establish an inference of discrimination sufficient to establish a prima facie case.  As discussed below, regardless of whether Robinson has established a prima facie case, RTD meets its burden under the *McDonnell Douglas* burden-shifting framework to show a legitimate, nondiscrimnatory reason for the disciplinary action and Robinson has not established that race was a determinative factor in the discipline or that RTD's reason is pretextual.

b.      *Legitimate, Nondiscriminatory Reason for Discipline*

───────────────────

[9] RTD argues that Robinson has not provided evidence suggesting an inference of discrimination.  (ECF No. 78 at 30.)  To support its position, RTD relies on CCRD's findings that the June 2015 discipline was for legitimate, nondiscriminatory reasons.  (*Id.*)  In doing so, RTD merges the first and second steps of the *McDonnell Douglas* burden-shifting framework.  RTD's arguments are more appropriately addressed under the second prong of the *McDonnell Douglas* framework.

22

RTD has established a legitimate, nondiscriminatory reason for disciplining Robinson with the June 10 Memo. While RTD does not dispute Robinson's assertion that RTD does not prohibit "co-workers from asking a co-worker to assist in correcting harassing behavior by another employee" (ECF No. 115 at 7, ¶ 58), RTD determined that it was inappropriate for Robinson both to contact an employee in another department (rather than a supervisor) and the spouse of his co-worker (ECF No. 78-2 at 18). Neither of these reasons for discipline relate in any way to Robinson's race. Therefore, RTD has established a legitimate, nondiscriminatory reason for the June 2015 discipline.

c.     *Evidence of Racial Motivation or Pretext*

Because RTD establishes a legitimate, nondiscriminatory reason for Robinson's discipline in June 2015, the burden shifts back to Robinson to offer evidence that race was a determinative factor or that RTD's explanation is pretextual. Robinson fails to do so. Essentially, Robinson argues that his June 2015 discipline resulted from RTD's failure to discipline Das when conflicts between the two first arose. (ECF No. 115 at 18.) In doing so, Robinson attempts to undermine the legitimacy of RTD's disciplinary decision by justifying his own behavior. However, it is not the Court's role to act as a "super personnel department" or determine the wisdom of an employer's decisions. *Salguero v. City of Clovis*, 366 F.3d 1168, 1177 (10th Cir. 2004). Employers have "substantial latitude . . . in making discipline related decisions." *Id.* RTD determined that the June 10 Memo was appropriate discipline for Robinson, and without additional evidence that RTD acted with a discriminatory purpose, the Court will not question RTD's decision to discipline Robinson for his actions.

Robinson makes no real argument that his race was a determinative factor in RTD's discipline. *See Garrett*, 305 F.3d at 1216. Robinson summarily claims that "white employees who did violate actual policies were not disciplined," but does not identify the employees or policies violated. (ECF No. 115 at 19.) Robinson does not present evidence showing any disparity in discipline between himself and other RTD employees. Robinson's statement, devoid of evidentiary support, cannot satisfy Robinson's burden to show that race was a determinative factor in his June 2015 discipline.

Robinson also claims that RTD's proffered justification for the disciplinary June 10 Memo was pretextual. (ECF No. 115 at 19.) Specifically, Robinson argues that the disciplinary justification in the memorandum is contradicted by the source documents, but does not cite those source documents or point out specific inconsistences. (ECF No. 115 at 17–18.) While Robinson claims that RTD's explanation for discipline has changed over time, he fails to point out any inconsistencies in RTD's explanations for the June 2015 discipline. To the contrary, a review of the record demonstrates that RTD's explanation for the discipline has remained consistent. (*See* ECF No. 78-2; ECF No. 78-6 at 9–10.)

Robinson thus fails to offer evidence that race was a determinative factor in the June 2015 discipline or that RTD's legitimate, nondiscriminatory reason for the June 2015 was pretextual. *See Proctor v. United Parcel Service*, 502 F.3d 1200, 1211 (10th Cir. 2007) (affirming grant of summary judgment where plaintiff failed to show factual dispute as to pretext). Accordingly, the Court grants summary judgment in the Defendant's favor as to Plaintiff's Title VII racial discrimination claim for the June 2015

discipline.

      3.     Failure to Hire (Title VII, § 1981)

          a.     *Prima Facie Case of Racial Discrimination for Failure to Hire*

To establish a prima facie case for failure to hire on the basis of race, Robinson must show that (1) he is a member of a protected class; (2) he applied and was qualified for the CSA position; (3) he suffered an adverse employment action; and (4) he was treated less favorably than others ("e.g., the position at issue remained open after the adverse employment action"). *See Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1134 (10th Cir. 2004). Robinson clearly satisfies the first and third prongs: he is African-American and was not hired for or promoted to the CSA position. The parties do not address the fourth prong. Because RTD went on to hire Bell, the Court assumes that Robinson also satisfies this prong. Therefore, the only point of disagreement on Robinson's prima facie case is whether Robinson was qualified for the position.

Whether Robinson was qualified for the CSA position is a disputed factual matter. RTD argues that Robinson was not qualified because of his background. In support, RTD cites in support the McKillop memorandum explaining Robinson's lack of qualifications for the CSA position due to his outdated experience with hands-on desktop support. (ECF No. 78 at 32.) RTD also suggests that Robinson was not eligible for the CSA position because of the June 10 memorandum: "employees currently involved in a corrective action or who have been subjected to a Performance Improvement Plan during the previous 12 months are not eligible to apply for a new position." (ECF No. 78 at 5 n.3, 32.) It is not clear from the record that the June 10 Memo constitutes ongoing corrective action that would automatically disqualify

Robinson from the CSA position. At the RTD Rule 30(b)(6) deposition, McKillop referred to the June 10 Memo as a "counseling memo," not a corrective action. (ECF No. 78-2 at 10.)

Robinson counters that he had the background required for the position. He did have a degree in the required field, several recent certifications in IT, and past experience in desktop support (though it had been a number of years since he held such a position).

At this point, the Court will assume that Robinson was qualified and thus has established a prima facie case.

### b. *Legitimate, Nondiscriminatory Reason*

At this stage, RTD's burden is to "merely proffer non-discriminatory reasons, not prove them." *Harp v. Dep't of Human Servs., Colo. Mental Health Inst. of Pueblo*, 932 F. Supp. 2d 1217, 1226 (D. Colo. 2013) (stating that a defendant's burden at this step of the burden-shifting framework is "exceedingly light"). RTD asserts that Robinson was not qualified, that Bell met the qualifications for the CSA position, and that Bell was more qualified than Robinson for the position. (ECF No. 78 at 31–32.) RTD presents a justification for its hiring decision that is legitimate and nondiscriminatory. Thus, at this stage, RTD has met its burden under the *McDonnell Douglas* analysis.

### c. *Evidence of Racial Motivation or Pretext*

In response to RTD's legitimate, nondiscriminatory hiring rationale, Robinson must offer evidence that race was a determinative factor or that RTD's explanation is pretextual. *Garrett*, 305 F.3d at 1216. Pretext may be demonstrated by inconsistences

or contradictions in an employers explanation. *Jones v. Okla. City Pub. Schs.*, 617 F.3d 1273. When faced with a claim that an exmployer's explanation for hiring a particular was pretextual, a court considers "the competing candidates' qualification only in the light of the facts available to the decisionmaker at the time of the decision." *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1211 (10th Cir. 2010). Where a plaintiff suggests that an employer's claim that one person had superior qualifications is pretext for discrimination, "a plaintiff must come forward with facts showing an 'overwhelming' 'disparity in qualifications.'" *Id*. (quoting *Jaramillo v. Colo. Judicial Dept.*, 427 F.3d 1303, 1309 (10th Cir. 2005)); *see also Hamilton v. Okla. City Univ.*, 563 F. App'x 597, 603 (10th Cir. 2014) (finding that a candidate was not overwhelmingly inferior to plaintiff where the candidate had completed all of the requirements for a PhD except for a dissertation and plaintiff already held a PhD).

A court must "proceed with caution when considering the relative merits of individual employees." *Jamarillo*, 427 F.3d at 1308. In this case, the Court is guided by the Tenth Circuit's decision in *Johnson*. *See* 594 F.3d at 1211. There, the Tenth Circuit found that the plaintiff could not support a claim of pretext where the hiree's qualifications were "arguably superior, and certainly not overwhelmingly inferior." 594 F.3d at 1211 (holding that a plaintiff must present "facts showing an overwhelming disparity in qualifications" to support a pretext claim). Moreover, because the employer presented the disparity in qualifications as a "separate and additional reason" for its hiring decision, the employer's (potentially inaccurate) determination that the plaintiff was unqualified was of no consequence. *Id.* at 1212.

In *Johnson*, the employer offered two legitimate, nondiscriminatory reasons for failure to hire the plaintiff: (1) the candidate hired was better qualified for the position and (2) the plaintiff lacked the required qualifications for the position. *Id.* In the instant case, RTD offers the same two justifications for hiring Bell instead of Robinson. (ECF No. 78 at 32.) In *Johnson*, the plaintiff challenged the employer's reasoning as pretextual because the hiree later proved himself to be unqualified for the position, and the plaintiff did not lack the qualifications for the position. 594 F.3d at 1211. Similarly, Robinson claims that he was more qualified than Bell, and that (counter to RTD's assertion) he was qualified for the CSA position. (ECF No. 115 at 15–17.)

Robinson's conclusory claim that he was "qualified for the CSA position, and more qualified than Ms. Bell" cannot alone sustain his claim at the summary judgment stage. (ECF No. 115 at 17.) *See In re Ribozyme Pharms., Inc., Sec. Litig.*, 209 F. Supp. 2d at 1111. Robinson does not present any facts to support an argument that he was more qualified than Bell for the CSA position, much less overwhelmingly so. *See Johnson*, 594 F.3d at 1211. Both candidates had degrees in information technology and certifications in various aspects of the field. (ECF No. 79-2 at 2; ECF No. 78-7 at 16.) Both had experience in information technology and had worked at RTD. On the facts in the record, the Court finds that the degree of difference between Robinson and Bell's qualifications for the CSA position does not suggest that RTD's proffered justification is pretextual. *See Johnson,* 594 F.3d at 1211.

Like the plaintiff in *Johnson*, Robinson also argues that, contrary to RTD's determination, he was qualified for the CSA position. (ECF No. 115 at 17.) *See*

*Johnson*, 594 F.3d at 1212.  This argument is of little use to Robinson because it does

not alter RTD's independent rationale for hiring Bell.  Like the employer in *Johnson*,

RTD justified hiring Bell both because Robinson lacked relevant experience and

because other applicants, including Bell, had more current or relevant experience than

Robinson.  (ECF No. 78 at 32; ECF No. 78-13 at 2.)  *See Johnson*, 594 F.3d at 1212.

In short, whether Robinson was qualified or not, RTD determined Bell to have superior

qualifications for the CSA position.  RTD's conclusion that Robinson was unqualified for

the CSA position does not establish that RTD's rational was pretextual.

Absent any facts to show that Robinson was *overwhelmingly more qualified* for

the CSA position than Bell, the Court finds that RTD's legitimate, nondiscriminatory

reason for hiring Bell was not pretextual.  The Court therefore grants RTD's Motion as

to Robinson's race discrimination claim for non-hiring or non-promotion under Title VII

and 42 U.S.C. § 1981.

## C.    Retaliation Claims

Robinson also alleges that RTD's employment decisions were made in retaliation

for Robinson raising complaints about co-workers and filing a charge of discrimination.

While Robinson's retaliation claims are not a model of clarity, the Court identifies two

separate incidents that Robinson claims were retaliatory in nature: (1) RTD's failure to

hire Robinson for the CSA position, and (2) Robinson's termination.[10]  (ECF No. 5 at

---

[10]  Even under a generous reading, Robinson fails to allege that his June 2015 discipline
was a result of retaliation for engaging in protected activity.  (ECF No. 5 ¶¶ 92–100.)  Nor does
Robinson allege that the January–March 2016 discipline resulted from retaliation for engaging
in protected activity.  (*Id.*)  Under Robinson's Fifth Claim for Relief, the only conduct in 2016 that
Robinson even mentions is his termination.  (*Id.* at ¶ 98 ("RTD terminated Robinson on March
11, 2016.").)

¶¶ 92–100.)

1.    Failure to Hire (Title VII)

The familiar *McDonnell Douglas* framework applies to Plaintiff's retaliation claim. *See Jeffries v. State of Kansas*, 147 F.3d 1220, 1231 (10th Cir. 1998); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).  To establish a prima facie case of retaliation under the *McDonnell Douglas* burden-shifting framework, Robinson must show that: "(1) he engaged in a protected activity; (2) a reasonable employee would have found the challenged action materially adverse; and (3) a causal connection existed between the protected activity and the materially adverse action." *Argo v. Blue Cross Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006).  To establish a causal link, a plaintiff must show "that the individual who took adverse action against him knew of his protected opposition." *Zokari v. Gates*, 561 F.3d 1076, 1081 (10th Cir. 2009); *see also Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1177 (10th Cir. 2007) (holding that a plaintiff did not establish a prima facie case of retaliation where she failed to offer any evidence that the individuals taking adverse action knew of plaintiff's protected activity).

Robinson fails to establish a prima facie case of retaliation because he presents no evidence of a causal connection between his protected activity and his non-hiring for

---

To the extent that the Complaint could be read to assert a claim for retaliatory discipline in 2015, the Court will briefly address the issue.  Regardless of whether Robinson can establish a prima facie case of retaliatory discipline, RTD had a legitimate, nondiscriminatory reason for disciplining Robinson.  *See* section III.B.2, *supra*.  No circumstances surrounding the June 2015 discipline suggest that RTD's stated reason for disciplining Robinson was pretextual, and Robinson makes no compelling argument to the contrary.  Thus, to the extent that Robinson raises a retaliation claim for the June 2015 discipline, the Court grants summary judgment for the Defendant on that claim.

the CSA position. The parties do not address the first two prongs of the prima facie case for retaliation. Rather, the parties dispute only whether there exists a causal connection between Robinson's complaints and the decision not to hire Robinson for the CSA position. For the reasons discussed below, RTD has the better argument that there is no genuine dispute of material fact concerning a causal nexus.

In its Motion, RTD satisfies its initial burden to show the absence of evidence establishing an inference of a causal connection between the protected activity and Robinson's non-hiring. *See Celotex*, 477 U.S. at 325. RTD states that Robinson lacks any evidence that Baker and Vesely, the persons charged with making hiring decisions, were aware of Robinson's internal EEO complaint of racial discrimination. (ECF No. 78 at 36.) RTD bolsters its assertion citing McKillop's July 20, 2015 memorandum, which indicated Baker was not aware of the June 10 Memo or surrounding circumstances. (*Id.*) RTD also points out that the hiring decision was made on June 30, six days before the internal EEO office met with any RTD employee (other than Robinson) concerning Robinson's internal EEO complaint. (*Id.*) These facts support a conclusion that Baker and Vesely had no knowledge of Robinson's actions, and thus no inference of a causal connection between Robinson's actions and his non-hiring. *See Zokari*, 561 F.3d at 1081.

In response to RTD's Motion, Robinson simply argues that RTD has not established that Baker and Vesely lacked knowledge. (ECF No. 115 at 14–15.) Robinson misunderstands his burden in response to RTD's Motion. Because Robinson will have the burden of proof at trial, Robinson bears the burden on summary judgment to establish facts to support his case, not simply to point out RTD's absence of

evidence.  *See Celotex*, 477 U.S. at 325.  Robinson does not satisfy his burden.  He

cites no evidence to support an inference that Baker or Vesely knew about his internal

EEO complaint.  And Robinson's response to the Motion further confirms the lack of

record evidence.  (ECF No. 115 at 15 ("There are no affidavits or sworn testimony from

Mr. Baker.").)  Absent any indication that Baker or Vesely knew of Robinson's actions,

Robinson cannot establish a prima facie case of retaliatory non-hiring or demonstrate

that he could carry his burden of proof at trial.  *See In re Ribozyme Pharms., Inc. Sec.

Litig.*, 209 F. Supp. 2d at 1111 ("If the respondent fails to present competent evidence

to establish every element of its claim or defense, entry of summary judgment in favor

of the movant is appropriate because the respondent cannot carry its burden of proof.").

The Court therefore grants summary judgment as to Robinson's retaliatory non-hiring

claim under Title VII.

      2.     <u>Termination (Title VII, CADA)</u>

      Generally, on a motion for summary judgment, if a moving party fails to carry its

initial burden of production, the nonmoving party is not obligated to produce anything.

*Kipling v. State Farm Mut. Auto. Ins. Co.*, 159 F. Supp. 3d 1254, 1263 (D. Colo. 2016);

*see also Oldham v. O.K. Farms, Inc.*, 871 F.3d 1147, 1150–51 (10th Cir. 2017) (quoting

*Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1310 (7th Cir. 1989) ("When a party moves for

summary judgment on ground A, his opponent is not required to respond to ground

B—a ground the movant might have presented by did not.")).  Under certain

circumstances, the Court may grant summary judgment on grounds other than those

raised in a summary judgment motion, but the nonmoving party must have adequate

notice that it would have to come forward with evidence on the issue. *Asia Strategic Invest. Alliances, Ltd. v. Gen. Elec. Capital Servs., Inc.*, 166 F.3d 346 (10th Cir. 1998). The Court finds that RTD failed to move for summary judgment on the issue of retaliatory termination and, on the record before the court, Robinson has established an unrebutted prima facie case of retaliatory termination.

RTD's Motion focuses its entire argument that the retaliation claims should be dismissed on Robinson's non-hiring. (ECF No. 78 at 34–37.) RTD fails to mention termination or events surrounding termination in the four pages of its Motion dedicated to the retaliation claims. (*Id.*)

Robinson's response to the Motion contains a single, passing reference to the connection between the discipline (and subsequent termination) and filing charges of discrimination and retaliation: "Each incident of discipline followed very soon after plaintiff lodged internal complaints of discrimination and harassment, and filed charges of discrimination with the EEOC/CCRD. . . . The temporal proximity of protected activity followed by discipline and other adverse action establishes an inference of discrimination and retaliation." (ECF No. 115 at 19.)

In RTD's reply in support of the Motion, RTD summarily argues that, were the Court to consider the January–March 2016 discipline that led to Robinson's termination as probative of Robinson's retaliation claim, "Robinson still has not met the burden to raise an issue of fact for the same reasons as set forth previously in this motion. . . . RTD terminated his employment for valid reasons." (ECF No. 124 at 19.) Apart from this conclusory statement, RTD makes no argument regarding any potentially legitimate, nondiscriminatory reasons for terminating Robinson either in its Motion or

33

reply in support of the Motion.[11]

While sparse, the facts on the record, absent any further elaboration or legal argument by RTD or Robinson, establish a genuine dispute of material fact as to the reasons for Robinson's termination. To wit, in June 2015, Baker made the initial decision not to hire Robinson. Thereafter, Robinson filed his First Charge alleging racial discrimination and retaliation for non-hiring. (ECF No. 78-27.) In September 2015, Baker became Robinson's direct supervisor. Over the next several months, Robinson was disciplined by Baker for various workplace behavior. (ECF No. 78-15; ECF No. 78-17.) Baker then recommended Robinson's termination. (ECF No. 78-20.) Robinson alleges that the temporal proximity of the protected activity (filing a discrimination charge) and his discipline and termination establish an inference of retaliation. (ECF No. 124 at 19.) *See also Annett v. Univ. of Kan.*, 371 F.3d 1233, 1239–40 (10th Cir. 2004) (finding that a plaintiff may establish an inference of retaliatory motive if adverse action closely follows engagement in protected conduct). RTD's reply belatedly and summarily suggests that "RTD terminated his employment

_____

[11] RTD also suggests that Robinson failed to exhaust his administrative remedies with respect to the retaliatory termination claim. Specifically, RTD states that Robinson's termination is not relevant to his retaliation claims because Robinson failed to exhaust his administrative remedies. (ECF No. 124 at 18–19 ("That argument [that Robinson's termination is relevant to his discrimination and retaliation claims] is misplaced because it does not address RTD's legal argument . . . that the only incidents pled in Robinson's complaint *for which administrative remedies have been exhausted* occurred in June 2015.").) RTD then cites the portion of its Motion that argues that Robinson failed to exhaust administrative remedies on his racial discrimination claims arising out of the January–March 2016 discipline and his subsequent termination. (The Court credited this argument, and dismissed Robinson's racial discrimination claims arising out of the Second Charge. *See* section III.B.1, *supra*.) However, RTD makes no argument about failure to exhaust the retaliation claim arising from the Second Charge. In any event, the Court finds that Robinson exhausted his administrative remedies with respect to his retaliatory termination claim.

for valid reasons." (ECF No. 124 at 19.)

Absent any specific factual assertions by RTD regarding a legitimate, nondiscriminatory basis for termination, the Court is left with those facts which establish a prima facie case of retaliatory discharge. On those facts alone, the Court finds that there is a genuine issue of material fact regarding the motivation for Robinson's termination and that a reasonable jury could infer that Robinson was terminated in retaliation for filing an employment discrimination charge. Thus, to the extent that RTD intended to move for summary judgment on retaliatory termination, the Court denies the Motion.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.      Plaintiff's racial discrimination claims under Title VII and CADA arising out of (1) Robinson's inability to apply for a Desktop Support position, (2) discipline other than the June 10 Memo, (3) instructions not to wear a bus driver uniform (part of the January–March 2016 discipline), and (4) Robinson's termination are DISMISSED without prejudice for failure to exhaust administrative remedies;

2.      Defendant's Motion for Summary Judgment is GRANTED as to the following claims:

   a.      Plaintiff's racial discrimination claim for the June 2015 discipline under Title VII and 42 U.S.C. § 1981;[12]

   b.      Plaintiff's racial discrimination claim for non-hiring under Title VII and 42

---

[12] Robinson's state claims arising out of this conduct were dismissed for lack of subject matter jurisdiction. (ECF No. 140.)

U.S.C. § 1981;[13] and

c.   Plaintiff's retaliation claim for non-hiring under Title VII;[14]

3.   Defendant's Motion for Summary Judgment is DENIED as to Plaintiff's claim of retaliatory termination under Title VII and CADA; and

4.   This matter REMAINS SET for a Final Trial Preparation Conference on June 28, 2018 at 2:30 PM, and a 4-day jury trial to commence on July 16, 2018 at 8:30 AM, both in Courtroom A801.

Dated this 13th day of June, 2018.

BY THE COURT:

William J. Martínez
United States District Judge

---

[13] Robinson's state claims arising out of this conduct were dismissed for lack of subject matter jurisdiction. (ECF No. 140.)

[14] Robinson's state claims arising out of this conduct were dismissed for lack of subject matter jurisdiction. (ECF No. 140.)